### AFFIDAVIT OF POSTAL INSPECTOR JUNE M. FOLEY IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT

I, June M. Foley, hereby state:

*INTRODUCTION AND AGENT BACKGROUND*

1.  I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed for 17 years. My investigative experience includes, but is not limited to, financial auditing, internal and external mail theft investigations, and financial crimes investigations. Since January 2004, I have been assigned to the Boston field office as a member of the Massachusetts Financial Crimes Task Force to investigate various types of financial crimes, including check, debit card, and credit card fraud, bank fraud and identity theft. I have made numerous arrests and executed search warrants in the field of financial crimes. I regularly attend fraud investigator working group meetings, and I receive training on fraud investigations through the International Association of Financial Crimes Investigators and the National White Collar Crime Center. I am also a member of the Board of Directors of the New England Fraud Investigators Alliance.

2.  This affidavit is being submitted in support of an application for a warrant to arrest Shawn Robert Pelley. There is probable cause to believe that from on or about January 1, 2010, through on or about August 5, 2010, Pelley participated in a scheme to use other people's identities to steal money, transfer the money to bank accounts, and withdraw it, all in violation of 18 U.S.C. § 1349 (conspiracy to violate 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)), 1028A (aggravated identity theft), and 2 (aiding and abetting). Shawn Pelley participated in this scheme with Bryan Wells, who pleaded guilty in *United States v. Wells*, No. 10-CR-10256-DPW (D. Mass. 2010).

1

3.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from witnesses and other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## THE CONSPIRATORS

4.     Shawn Robert Pelley has a lengthy criminal record with convictions for identity theft and fraud-related offenses. As detailed in the following paragraphs, while Pelley was incarcerated at the Nashua Street Jail in Boston, he used the jail's phone system to participate in a fraud scheme undetected, from inside the jail. Pelley used the phone system to give Wells orders about what he, Pelley, wanted done to steal money from the financial accounts of various victims, and how he wanted the money to appear legitimate. Pelley also used the phone system to talk directly to various third parties, such as the Massachusetts Registry of Motor Vehicles, to secretly obtain useful information about how to accomplish the fraud.

5.     Although the Wells indictment focused on a fraud against a victim identified as N.R., Wells has also admitted to having also defrauded others, including a victim identified as R.P.O., of approximately $570,000 in total. This affidavit focuses mostly on Pelley's and Wells's conspiracy to steal money from R.P.O.'s TD Ameritrade account, although the two conspired to steal money from a variety of other victims.

## INTRODUCTION

6.     As reflected below, the scheme consisted of two phases. The first phase was to obtain the money, either by cashing counterfeit checks drawn on victims' checking accounts or by executing fraudulent documents to transfer money from victims' financial accounts. The

second, simultaneous, phase was to transfer the money into one or more accounts taken out in other people's names so that the accounts would not be readily traceable to Pelley or Wells. The money would then be withdrawn as cash or transferred to yet other accounts.

7. To accomplish this, Pelley and Wells had to amass information about the identities of the people whose money they would take, the locations of these people's bank and investment accounts, and also the identities of the people whose names they would use to establish the bank accounts into which the money would be transferred.

## SUMMARY OF THE R.P.O. THEFT AND WELLS'S INVOLVEMENT

8. One of the earlier thefts in Pelley's and Wells's scheme was the unauthorized transfer of $120,000 from R.P.O.'s TD Ameritrade investment account into other bank accounts that Wells opened in R.P.O.'s name.

9. On or about February 11, 2010, a person posed as R.P.O. to transfer $120,000 from R.P.O.'s TD Ameritrade investment account (# XXX-XX1619) into a TD Bank account (# XXXXXX7389) that had been fraudulently opened in R.P.O.'s name. The transfers are reflected in documents obtained from TD Ameritrade and TD Bank. According to TD Bank and Chase Bank records, some of the money from the TD Bank account was wired to a Chase Bank account (# XXXXX1063) newly-established in R.P.O.'s name, and some of the money from the TD Bank and Chase Bank accounts was withdrawn as cash. All of these transactions occurred on February 11 and 12, 2010. The following diagram depicts the transactions:



10. R.P.O. told investigators that he did not authorize the $120,000 transfer, did not open the TD Bank account in his name, did not open the Chase Bank account in his name, and did not authorize any of the transfers or withdrawals. I have listened to a recording that TD Ameritrade recorded of somebody complaining about the $120,000 transfer and from talking to R.P.O. personally, I recognized that the person complaining was R.P.O.

11. TD Ameritrade also provided investigators a number of telephone calls that the company had recorded of a person purporting to be R.P.O. and ultimately, on February 11, 2010, authorizing that $120,000 be wired from R.P.O.'s TD Ameritrade account to TD Bank. I recognize the caller's voice as Bryan Wells and am familiar with Wells's voice because I spent several hours with Wells when I assisted in transporting him from Vermont to Massachusetts and remained with him until his arraignment at U.S. District Court in Boston.

12. Records provided by TD Bank indicate that the account had been opened on February 8, 2010, several days before the $120,000 wire from TD Ameritrade. The TD Bank records indicate that the account had been opened by R.P.O. using Florida driver's license # O254775693870. Records provided by Chase Bank indicate that the account had been opened on the same day as the TD Bank account, February 8, 2010, using the same Florida driver's license.

13. Records provided by Florida show that this driver's license had been obtained five days earlier, on February 3, 2010, and the picture on the license is of Bryan Wells. The license records include R.P.O.'s true date of birth and Social Security number, presumably submitted by Wells. One of the documents that Wells used in Florida as identification was a Massachusetts driver's record for R.P.O., which included R.P.O.'s driver's license number, but not R.P.O.'s picture. Other documents submitted to Florida as identification include a copy of R.P.O.'s birth certificate issued on February 1, 2010, and a W-2 purporting to have been issued to R.P.O. R.P.O. verified that the birth certificate appeared to be an accurate copy of his birth certificate, but that the W-2 was bogus, although it included some accurate details about him, including his name, his address, the name of his company, and his Social Security number.

14. From these facts, it appears that Wells obtained a copy of R.P.O.'s birth certificate on February 1, 2010, a fake W-2 with some real information about R.P.O., and R.P.O.'s driver license number, and used that information to obtain a legitimate, but ultimately fraudulent, Florida driver's license in R.P.O.'s name on February 3, 2010. Wells then used that Florida driver's license to open the TD Bank and Chase Bank accounts in R.P.O.'s name on February 8, 2010. He then posed as R.P.O. to TD Ameritrade on February 11, 2010 and transferred R.P.O.'s money among the accounts and withdrew large amounts of it as cash on

February 11 and 12, 2010.

## EVIDENCE OF PELLEY'S PARTICIPATION

15. According to records obtained from TD Ameritrade, one of the phone numbers used by Wells to call TD Ameritrade was 617-309-7570. According to other records obtained in the investigation, Wells used another number (617-888-5302) to open a Citizens Bank account (XXXXXX3442) in the name of another victim, identified herein by the initials R.N.C. Both numbers were used by prepaid cell phones.

16. Investigators from Suffolk County Jail were asked to search inmate telephone records for calls to telephone numbers that Wells had used during his crime spree, including the 617-309-7570 and 617-888-5302 numbers mentioned above. (Inmate telephone calls at this facility are recorded along with the outgoing number dialed; the inmates are notified of the recording.)

17. Doing so identified telephone calls made by Pelley. I could identify Pelley as a party to these calls by recognizing his distinctive voice. I learned how Pelley's voice sounded initially by playing recordings for another law enforcement officer, Boston Police Detective Steven Blair, who has talked to and interviewed Pelley before, and having Detective Blair identify for me which voice was Pelley's. Afterwards, I was able to identify Pelley's voice by its distinctive characteristics, and also because of the subject matter of the conversations. Detective Blair also identified phone calls made by Pelley.

18. Pelley's calls demonstrated that he was involved with the fraud in four ways. First, Pelley had directed Wells on what to do and when to do it. Second, through conference calls arranged by Wells, Pelley at times directly talked to people outside the jail to ferret out information that he and Wells could exploit to accomplish the fraud. Third, Pelley directed

Wells to provide him and his sister money or other things of value. Fourth, Pelley plotted with his sister about her fabricating documents and accounting records to make the fraud proceeds appear as if they had been earned through legitimate business income from Wells's company Remarkably Radiant.

19.  In their calls, Pelley not only instructed and directed Wells what to do: Pelley also directly talked to sources of identification information or documents to determine how best to obtain the information or documents that the scheme required. So Pelley had Wells conference-call the Massachusetts Registry of Motor Vehicles so that Pelley could have a direct conversation with the RMV, probing how to obtain a duplicate of R.P.O.'s driver's license. And Pelley had Wells do the same with the IRS so that Pelley could have a direct conversation with the IRS, probing how to obtain copies of tax returns and W-2s.

20.  The following are excerpts from telephone calls between Pelley and Wells regarding the R.P.O. fraud made at or around the indicated dates and times:

21.  During the planning phase, there were several calls regarding whether R.P.O. was a worthy target:

    a.  January 31, 2010: Pelley asked Wells, "Did you ever look into that [R.P.O.] thing that I asked you to?" Wells responded that he had.

    b.  January 31, 2010: Pelley told Wells, "He pays $42,000 a month in child support. What does tell you?" Wells responded, "He has megabucks."

    c.  February 2, 2010: in the context of discussing R.P.O., Pelley discussed pulling "his Dun & Bradstreet." From the telephone calls that I listened to, Pelley and Wells frequently discussed obtaining other people's personal information from Dun & Bradstreet reports.

22. During the information-gathering phase, several calls suggest that Wells and Pelley attempted to obtain R.P.O.'s personal and financial information from various sources, including the IRS, and to learn how Wells could obtain a Florida driver's license in R.P.O.'s name:

    a. February 2, 2010: On a conference call with the Florida Registry of Motor Vehicles, Pelley talked to a customer service representative and asked what he needed to do to get a driver's license in Florida. This was a day before Wells obtained the Florida driver's license with R.P.O.'s name on it.

    b. February 2, 2010: On a conference call with R.P.O.'s management company, Pelley talked to a receptionist and asked to talk to the company's CFO, but reached voicemail. Pelley then asked Wells, "Do you have his date of birth and social?" Wells responded, "Yes." From the context of the call, I understood Pelley and Wells to be referring to R.P.O.

    c. February 2, 2010: On a conference call with the Massachusetts Registry of Motor Vehicles, Pelley introduced himself as Michael Pelley and told the RMV, "I'm in Miami and need to fly to London and I've lost my wallet and need a new license. What do I need to do?" From the context of this and other calls, I understood Pelley to be figuring out what information Wells would need to have R.P.O.'s driver's license sent overnight to Florida.

    d. February 2, 2010: On a conference call with the Massachusetts RMV, Pelley identified himself using R.P.O.'s first name and asked for a shipping tracking number for the driver's license that the RMV had sent out. This was a day before Wells used R.P.O.'s driver's license number or driver's record to

obtain a driver's license in R.P.O.'s name in Florida.

e.  February 2, 2010: Pelley told Wells to go to an IRS office in Florida to obtain printouts of R.P.O.'s tax returns for the purpose of seeing R.P.O.'s financial account information.

23.  Pelley and Wells apparently wanted to ensure that TD Ameritrade could not contact R.P.O. about their fraudulent transfers:

a.  February 10, 2010: Pelley told Wells, "I want you to get on the phone to Verizon to cancel his service and I want you to put me through to TD Ameritrade. We can liquidate his stocks and get more money."  According to R.P.O., on February 11, 2010, he learned that his home phone and cellphone were not receiving calls.  When he checked with Verizon about his home phone service, the company told him that his home phone was being forwarded to a cellphone number.  When he called AT&T about his cellphone service, the company told him that his cellphone had been reported lost.  From these facts, there is cause to believe that Wells and Pelley turned off R.P.O.'s cellphone and had R.P.O.'s home phone calls forwarded so that any questions from TD Ameritrade about the $120,000 transaction would not reach R.P.O.

b.  February 10, 2010:  Pelley told Wells how to change R.P.O.'s AOL password.  Given the context, there is cause to believe that Wells and Pelley intended to lock R.P.O. out of his AOL e-mail account so that R.P.O. would not receive any details about the transactions by e-mail, either.

24.  Pelley and Wells also discussed the financial arrangements in some detail:

a.  February 10, 2010:  Wells told Pelley, "I'm good with doing the account

so you can get your 40."

b.      February 10, 2010:  Pelley told Wells, "We are not doing the margin account: we are doing the wire."

c.      February 10, 2010:  Pelley told Wells. "This is what I want you to do: contact TD Bank, get the account number, and routing number. Check with TD Ameritrade and check what phone number they have." TD Bank was the bank to which Wells first transferred $120,000 of R.P.O.'s money.

d.      February 10, 2010:  Pelley told Wells, "Call Ameritrade at 8 a.m. Change password on his e-mail tonight at 1 a.m. Call Ameritrade at 8 a.m. and request a wire out of my cash account to my TD Bank account or Chase; it doesn't matter." Wells responded, "I will use the TD account."

e.      February 10, 2010:  Wells asked Pelley, "How much are we wiring?" Pelley responded, "120."  As mentioned above, the next day, Wells wired $120,000 from R.P.O.'s TD Ameritrade account.

f.      February 11, 2010:  Pelly told Wells, "I want you to call TD Bank and Ameritrade to check the accounts. Then I want you to get everything. You are leaving the hotel."

g.      February 11, 2010:  Pelley told Wells, "You are going to do two things: ATM first, then wire out 80,000 to Chase, go to another TD get cash 15,000, get a cashier's check 35,000, leave 5,000. Put glue on your fingers or be careful how you touch the deposit slip." As mentioned above, Wells wired $80,000 of R.P.O.'s money to a Chase Bank account.

h.      February 11, 2010:  Pelley asked Wells, "What's going on?"  Wells

responded, "Money has been wired."

25. Pelley and Wells also discussed paying Pelley's sister:

   a. February 11, 2010: Pelly told Wells, "You need to do something for my sister, she needs a car."

   b. February 16, 2010: "Deposit a check or Western Union into my sister's Fidelity account. Can't deposit cash."

26. Although it appears that Defendant did not receive a deposit into a Fidelity account, records obtained from the Massachusetts RMV indicate that Pelley's sister obtained title to a vehicle on or around July 7, 2010.

27. Investigators listened to other telephone conversations between Pelley and others regarding the scheme as late as August 5, 2010.

## CONCLUSION

28. Based on the information described above, there is probable cause to believe that from on or about January 1, 2010, through on or about August 5, 2010, Pelley participated in a scheme to use other people's identities to steal money, transfer the money to bank accounts, and withdraw it, all in violation of 18 U.S.C. § 1349 (conspiracy to violate 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)), 1028A (aggravated identity theft), and 2 (aiding and abetting).

Sworn to under pains and penalties of perjury,

JUNE M. FOLEY
UNITED STATES POSTAL INSPECTOR

Subscribed and sworn to before me on March 30, 2012

UNITED STATES MAGISTRATE JUDGE